STATE, Respondent, v. HUNT, Appellant.

*No. State 98. Argued January 5, 1972.—Decided February 1, 1972.*
(Also reported in 193 N. W. 2d 858.)

736

738

For the appellant there was a brief by *Richard E. Lent* and *Oldenburg & Lent,* all of Madison, and oral argument by *Richard E. Lent.*

For the respondent the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HANLEY, J.   The following issues are presented on this appeal:

(1)  Did the trial court err in denying defendant's motions to suppress the confessions;

(2)  Was an alleged inculpatory statement made by defendant improperly admitted without a prior determination of voluntariness;

(3)  Was the admission of two different video tapes of the same confession error;

(4)  Did the trial court err in allowing the jury to hear the audio-taped confession after deliberations had begun,

where the first playing of the tape had been almost inaudible;

(5) Did the court err in accepting the qualifications of the ballistics witness;

(6) Was it error to permit testimony that hairs could be identified as coming from a particular animal or person; and

(7) Was there sufficient credible evidence to convict defendant?

### Admissibility of confessions.

Defendant contends that his confessions should not have been admitted into evidence on the grounds that they were involuntary and resulted from an unreasonable length of detention and a denial of counsel during questioning. The trial court, holding both a *Miranda* and a *Goodchild* [2] hearing, made separate findings of fact and conclusions of law, holding that the dictates of *Miranda* had been adhered to and that the confession was voluntary. Where detailed findings of fact are made by the trial court, those findings will not be overturned unless they are against the great weight and clear preponderance of the evidence. *State v. Herrington* (1969), 41 Wis. 2d 757, 771, 165 N. W. 2d 120.

The essential question, in determining the voluntariness of a confession, is whether the confession was coerced, or the product of improper pressures exercised by the police. To be admissible into evidence, a confession must be the voluntary product of a free and unconstrained will, reflecting deliberateness of choice. *State v. Hoyt* (1964), 21 Wis. 2d 284, 294, 128 N. W. 2d 645. The question of voluntariness must be adjudged by examining all the facts surrounding the confession, under the "totality-

---

[2] *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753.

of-the-circumstances" test. *Fikes v. Alabama* (1957), 352 U. S. 191, 77 Sup. Ct. 281, 1 L. Ed. 2d 246.

The circumstances surrounding the confessions herein, as found by the trial court and amply supported by the record, were that defendant was treated courteously throughout the interrogation process and was never threatened or intimidated. No promises were made to him. He was given frequent opportunities to rest between periods of questioning. No period of interrogation lasted longer than two and one-half hours. Defendant was served food at regular mealtimes and provided with coffee and cigarettes whenever desired. He was not disturbed by anyone during the nighttime sleeping hours. These facts do not indicate any element of coercion. From the viewpoint of coercion, the confessions were free of any constitutional taint.

Defendant contends that he was detained by police for an unreasonable length of time before his initial appearance in court and that his confessions should have been suppressed for that reason. This court has held that an unreasonable detention amounts to a denial of due process under the Wisconsin Constitution and renders inadmissible any confession obtained during such unreasonable period of detention. *Reimers v. State* (1966), 31 Wis. 2d 457, 468, 143 N. W. 2d 525. Long detentions are looked upon with extreme disfavor by this court. *State ex rel. Van Ermen v. Burke* (1966), 30 Wis. 2d 324, 338, 140 N. W. 2d 737. The reason for the rule excluding confessions obtained during a period of unreasonable detention is to prevent the weakening of the resistance of an accused by the psychological pressure of being held in custody and "worked upon" by the police in order to obtain evidence—*Embry v. State* (1970), 46 Wis. 2d 151, 160, 174 N. W. 2d 521.

However, merely because a person was held in custody for a length of time before being taken before a court does not necessarily mean that the period of detention was ipso

facto unreasonable. There is no set period of time during which questioning can take place, but beyond which a defendant must either be released or taken before a court and charged with a crime. Postarrest detention should be permitted as long as the purpose is reasonable and the period of detention is not unjustifiably long. This court has recognized that a person can be detained for a period of time after his arrest in order for authorities to determine whether to release the suspect or to make a formal complaint. *Phillips v. State* (1966), 29 Wis. 2d 521, 534, 139 N. W. 2d 41. The detention may also continue to allow the authorities to check out the story related by either the accused or the complaining witness. *State v. Fransisco* (1950), 257 Wis. 247, 43 N. W. 2d 38.

We think that the period of detention in the instant case was not excessive and that the purpose for the detention was reasonable. Although defendant was questioned intermittently from about noon to 8:50 p. m., on January 20th, he was not being "detained" during that period, since the defendant voluntarily went to the station and the police made it clear to him that he was not under arrest and was free to leave whenever he so desired. As stated in *Huebner v. State* (1967), 33 Wis. 2d 505, 516, 147 N. W. 2d 646:

". . . We think a law-enforcement officer may temporarily stop a person and request him to furnish information, to respond to questions or to appear at the police station without arresting such person or without such requested cooperation being considered an arrest. However, it must be made plain to the person he is not under arrest and there is no legal obligation to comply with the request to appear at the station, and the act of the person must be voluntary and uncoerced. . . ."

Here the period of detention commenced at the time defendant was booked on "suspicion of murder," which occurred at 8:50 p. m., on the night of January 20, 1970. Detention continued through the night. Detention during

the nighttime hours cannot be held to be unreasonable, since defendant had to be allowed to sleep. If questioning had continued during the night, the deprivation of sleep could be considered a factor of coercion, tainting any confession obtained during the interrogation. *State v. Hoyt, supra,* at page 294. Therefore, the time between 8:30 a. m. and 11:30 p. m., on January 21, 1970, is the only period during which detention could arguably be considered unreasonable.

During this fifteen-hour period, the police did not have sufficient evidence to charge the defendant with a crime. Defendant had admitted that the murder weapon was in his coat pocket on the day of the killing, but continuously maintained that he had taken off his coat and hung it up in the Lobby Bar, at 10 a. m., the morning of the 19th, and that he had not worn the coat as he went back and forth between the Lobby Bar and the 400 Bar. Therefore, he asserted that some unknown person must have taken the gun from the pocket of his jacket, committed the murder and returned the gun to the coat pocket in an attempt to cast suspicion on defendant. The police had a duty to check out this possibility and to probe defendant's memory for other facts relating to his whereabouts on the day in question. As stated by the trial court in its conclusions of law:

"During the period of detention after the arrest at 8:50 p. m., January 20th including the interrogation from 8:30 a. m., January 21st until the time of the first confession at 9:50 p. m., January 21st the police were, under the *Phillips Doctrine,* well within their rights to continue interrogation for the purpose of determining whether to formally charge the defendant or release him. The reason for the continued interrogation was to learn if possible whether or not someone else may have removed the gun from the defendant's coat pocket. A memory recall by the defendant during that period of time might well have provided a suggestion of someone else who might have worn the coat or who might have been seen

near the coat, or memory recall may have produced the name of some person who might have felt of the coat pocket during some particular time. The district attorney had stated that he would not issue a complaint upon the basis of the information they had at the time of the arrest."

We conclude that these findings and conclusions are not against the great weight and clear preponderance of the evidence as revealed in the record, and that the period of detention cannot, therefore, be said to have been unreasonable.

Finally, defendant contends that his confessions should not have been admitted into evidence because he was denied counsel during police questioning. This contention is not supported by the record. The evidence shows that defendant was frequently advised of his *Miranda* rights, with special emphasis being placed upon the right to counsel. Defendant repeatedly stated that he did not want to speak with an attorney. During his interview with Mr. Thompson, the polygraph operator at the state crime laboratory, defendant insisted that he would be his own attorney and indicated that he mistrusted white attorneys, having been raised in Mississippi. Although Mr. Thompson pointed out that defendant knew nothing of legal procedure, defendant remained adamant.

Several times during January 21, 1970, lawyers from Legal Services Center, Inc., Dane County, contacted the police department and requested permission to speak with defendant. Their requests were denied because defendant had asserted that he did not wish to see legal counsel. The officers had no duty to provide counsel for defendant in light of his repeated waiver of the right to speak to an attorney. Moreover, this is not a case in which an attorney who customarily represents a person is denied permission to speak with his client. The attorneys from Legal Services Center, Inc., Dane County,

never took the position that they had a right to see the defendant or that they represented him.

The trial court found that at one point during questioning, defendant had stated "I want Toman" to Officer Winston. Questioning ceased at that point while the officer attempted to locate the telephone number of Attorney Neil Toman. Before the attorney was contacted, however, defendant withdrew his request, stating that he did not want a lawyer. *Miranda v. Arizona, supra,* at page 474, states the following rule:

". . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

Taken out of context, this question would seem to state an absolute rule. However, it has been held that there is no constitutional barrier to prevent a person in custody from changing his mind and withdrawing his request for counsel, so long as the withdrawal is voluntary. *Sharlow v. State* (1970), 47 Wis. 2d 259, 269, 270, 177 N. W. 2d 88, certiorari denied, 400 U. S. 881, 91 Sup. Ct. 126, 27 L. Ed. 2d 119. The trial court, basing its conclusion on the testimony of the police officers, found that defendant voluntarily waived his right to counsel after having requested to see Attorney Toman. The testimony of the police cannot be said to be inherently incredible, and this court is, therefore, bound by it. *State v. Chacon* (1971), 50 Wis. 2d 73, 75, 183 N. W. 2d 84. In the instant case, from the facts of the record, we are satisfied that the confessions were given voluntarily, are not constitutionally tainted and were properly admitted.

*Inculpatory statement.*

Defendant contends that the trial court erred in admitting inculpatory statements made by the defendant without first finding that the statements were given voluntarily. The statements alleged to be inculpatory were revealed at trial by Officer Daryl O. Jensen, who questioned defendant prior to administering a lie detector test. On direct examination, he testified as follows:

"*Q.* What did [defendant] say?
"*A.* He stated that he left his apartment at Truax Field; had gone to the Lobby Tavern, and from the Lobby Tavern he went to his girl friend's house. He stayed there and then he went back to the Lobby Tavern. I then questioned him as to whether or not he drank anything during the day, and he stated that he had had a few beers, I believe, and a brandy, that he had one or something to that effect. I then questioned him if his girl friend was white or colored, and he stated that his girl friend was white. I asked him if he liked—if he had many girl friends that were white, and he stated 'Yes.' I asked him if he ever had sexual relations with a white girl and he said he never had been refused yet, and I said, 'Except one,' and he stated, 'Who is that?' and I said, 'Jeanne Broomell.' He threw his hands in the air and he laughed and that was it.
"*Q.* Did he ever deny he had been refused by Jeanne Broomell?
"*A.* No, sir, he did not."

No objections were made during this recital. On cross-examination, defense counsel elicited the following testimony:

"*Q.* Now, Sergeant Jensen, you had—you had very brief facts in your possession at this time, right?
"*A.* That's right, sir.
"*Q.* And you had no facts in your possession to indicate that this Defendant had ever asked Jeanne Broomell for sexual relations, had you?
"*A.* No, sir.

"*Q*. And that was that we might call a leading or suggestive question of him then by you, was it?

"*A*. [after objection] Yes, sir."

Apparently, defendant assumes that his failure to deny that he had been refused sexual relations by Mrs. Broomell amounted to an admission. We do not agree. Here the defendant was not totally silent following the inquiry. His laughter could be considered by the jury to be as much a denial as an admission.

Furthermore, defense counsel did not object to the statement at the time it was admitted into evidence, but rather chose to clarify the "leading" character of the inquiry and the fact that it was not based on facts within the knowledge of the officer. This would appear to have amounted to a strategic waiver of any objection to the admission of the statement. *State v. Cole* (1971), 50 Wis. 2d 449, 184 N. W. 2d 75. It is clear that the trial court did not err in admitting this testimony or in failing to grant a new trial based upon this objection.

### *Video-taped confessions.*

Defendant objects to the fact that the trial court permitted the jury to see two video tapes of his third confession, asserting that the confession was overemphasized and that the evidence was merely cumulative. A similar contention was raised in *Kwosek v. State* (1960), 8 Wis. 2d 640, 100 N. W. 2d 339. In that case this court stated the following at pages 644 and 645:

"Plaintiff in error contends that the jury became prejudiced by hearing twice what his counsel calls 'the gory details.' We think no error was committed. It is largely a matter of discretion for the trial court to determine how many witnesses may testify to the same event, though the event involves unpleasant details. When the evidence becomes merely cumulative, the trial court may

refuse to hear additional witnesses on the same subject. Even if the two confessions were identical in every respect, we would find that there was no abuse of discretion in admitting the evidence concerning them, the confessions being made at different times and one being oral and the other by written, signed statement."

We find no abuse of discretion in admitting two video tapes of the same confession. The reason the trial court permitted the jury to see both was that one of the tapes gave a better view of the facial expressions of the defendant. This was a justifiable exercise of discretion.

### Audio tape during deliberations.

Defendant's second confession was recorded on audio tape. This tape was played for the jury during the state's case in chief. However, the recorder on which it was played back was defective, and the tape was almost inaudible. During deliberations the jury requested to hear the tape recording again. Since excerpts from testimony are frequently read to the jury at its request during deliberations, it would not be error for the jurors to hear the taped confession for a second time. This is especially true in the instant case, since a different tape recorder was utilized for the second playing, which allowed the jury to clearly hear the recording.

### Qualifications of ballistics witness.

A witness from the state crime laboratory was called by the state to testify that the bullet found in the body of Mrs. Broomell was fired from the gun defendant had in his possession on the day of the murder. Defendant objected to the qualifications of this witness. The area of competency of an expert witness is generally left to

the trial court. *Doelger & Kirsten v. National Union Fire Ins. Co.* (1969), 42 Wis. 2d 518, 524, 167 N. W. 2d 198.

Defendant contends the fact that the witness studied under only one person, knew little of recent literature on the subject of ballistics, and did not reveal his academic training in the area demonstrates that the trial court erred in allowing him to testify. However, the record reveals that the witness had great experience in the field of ballistics. This experience was sufficient for the trial court to permit him to render an expert opinion.

*Evidence on identification of hairs.*

Other expert witnesses were called by the state. One identified a hair found on the murder weapon as a cat hair which came from the pet cat belonging to the Broomells. Similarly, another expert testified that hairs found in the lining of defendant's jacket belonged to Mrs. Broomell. Defendant contends that the jury was misled by the definite identification of the hairs, since a leading text, Gradwohl's *Legal Medicine* (2d ed. 1968), Hair As Evidence, states, at page 230, that it is impossible to assert that any given hair could have come only from one particular animal. Defendant resorted to this text as authority during cross-examination of the witnesses. If the witnesses overstepped their bounds in testifying that a particular hair came from a particular cat or person, their testimony was subject to impeachment in the eyes of the jury. Moreover, the record reveals that the testimony of the witnesses was not as definite as defendant contends, since one of the state experts admitted that the identification was not an absolute certainty.

Defendant contends that he was unduly surprised by the testimony of the experts. He admits that he learned

of the general nature of the witnesses' testimony three days before the experts took the stand. Furthermore, the record reveals that defense counsel conducted a skilled cross-examination, which hardly supports his contention of lack of time for preparation. Clearly, defendant has failed to show surprise. The testimony was properly admitted.

*Sufficiency of evidence.*

Finally, defendant asserts that no reasonable jury could have found him guilty beyond a reasonable doubt. He refers to the testimony of his alibi witnesses and to the opinions of the psychiatrist, who testified as to defendant's susceptibility to suggestion in stress-filled situations. It is well settled that the credibility of witnesses and the weight to be given to their testimony is to be determined by the finder of fact. Here the testimony of the alibi witnesses was conflicting. This court will not reverse merely because the jury disbelieved defendant's alibi. *State v. Stevens* (1965), 26 Wis. 2d 451, 464, 132 N. W. 2d 502. We are satisfied that a review of the record demonstrates that there was sufficient evidence to warrant conviction, and that there are no grounds to justify granting a new trial in the interest of justice.

*By the Court.*—Judgment and order affirmed.