**UNITED STATES of America, Plaintiff,**

v.

**Charles W. SHEARS, Defendant.**

**Crim. No. R–84–00396.**

United States District Court, D. Maryland.

Aug. 2, 1985.

Asst. U.S. Atty., Mark Berthiaume, Baltimore, Md., for U.S.

Paul R. Kramer, Stuart Snyder, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

### Introduction

This case presents the Court with a second opportunity to pass upon the voluntariness, and hence the admissibility, of a custodial statement elicited by law enforcement officers.

The defendant in this case was arrested at the Baltimore-Washington International Airport on August 14, 1984. On August 22, 1984, a five-count indictment was returned charging the defendant with conspiracy to distribute cocaine and related offenses. The defendant filed a number of pretrial motions, including a motion to suppress physical evidence seized from the defendant and a motion to suppress statements made by the defendant while in cus-

tody following his arrest. Trial of the case was set for December 3, 1984. On that day, the Court heard testimony and argument on defendant's pretrial motions. By oral ruling later formalized by written Order, the Court denied defendant's motion to suppress physical evidence and granted defendant's motion to suppress statements.

Following the swearing of a jury panel but prior to the commencement of opening statements, a mistrial was declared upon motion of the defendant on December 4, 1985, because of sudden and widespread publicity concerning an undercover drug investigation which ended in tragedy.[1] While the incident was unrelated to the case at bar, the Court believed that the defendant's right to a fair trial might be jeopardized by media reports of the drug-related death. Following the declaration of a mistrial, the government noted an appeal of the Court's Order suppressing defendant's statements. The Court postponed scheduling a new trial date pending the disposition of the government's appeal.

On May 23, 1985, a divided Fourth Circuit panel reversed this Court's Order suppressing defendant's statements. *United States v. Shears*, 762 F.2d 397, 403 (4th Cir.1985) (Winter, C.J.).[2] While concluding that the facts relied upon by this Court in its oral ruling were insufficient to support a finding that the defendant's confession was involuntary, the majority noted that its conclusion "does not necessarily mean that defendant's statements must be admitted or that a further hearing is required to determine their admissibility." *Id.*

In light of the Fourth Circuit opinion, this Court allowed the defendant to reassert his suppression motion on the basis of the record then developed. The defendant renewed that motion on June 17, 1985, and the government filed its opposition on July 1, 1985. The defendant, in turn, filed a

---

1. On December 3, 1984, an undercover narcotics officer was murdered in Baltimore while negotiating a drug transaction with a target of the investigation. DEA Agent Boronyak, who had testified at the suppression hearing in this case and was expected to testify at trial, was wound-

ed during a shootout following the murder of his fellow officer.

2. Judge Murnaghan, writing in dissent, expressed his belief that this Court's Order was not clearly erroneous and should have been affirmed.

reply brief on July 15, 1985. The Court now rules without need for a hearing pursuant to Local Rule 6 (D.Md.1985).[3]

### Facts [4]

The defendant was arrested on August 14, 1984, outside the airmail facility at Baltimore-Washington International Airport after he picked up an airmail parcel which contained cocaine. Drug Enforcement Administration (DEA) agents advised the defendant of his *Miranda* rights and asked the defendant whether he wished to have his truck left upon the airport parking lot or towed to a secure location. The defendant expressed his desire that the truck remain at the airport.[5]

DEA Agents Coront and Crawford transported the defendant to the DEA office in Baltimore for processing. Coront and Crawford then took the defendant to the United States Courthouse, which is across the street from the building housing the DEA office, where a magistrate conducted defendant's initial appearance and set defendant's bail at $10,000, cash or corporate surety.

While in the Marshal's lockup in the courthouse following his initial appearance, the defendant attempted to make a telephone call. Agent Coront told the defendant that the agents in charge of the case would like to talk with the defendant. Coront further advised the defendant that if the defendant wished to cooperate with the agents, it was preferable that no one know of defendant's arrest. The agent also indicated that defendant would not need a bondsman if he cooperated with the agents.[6] The defendant made a telephone call to his brother. Thereafter, the defend-

ant was transported to the Baltimore City Jail where he remained in custody overnight.

Following the discussion between defendant and Agent Coront on August 14, Agent Crawford advised DEA Agent Boronyak, the agent in charge of the case, that Agent Coront believed that the defendant was willing to cooperate. Agent Boronyak was unable to pursue the matter that day because of his involvement in an unrelated investigation.

During the evening of August 14, the defendant's brother contacted a bail bondsman in an effort to secure the defendant's release. The bondsman made arrangements with defendant's family to attempt to post bond the next day. On the morning of August 15, the bondsman contacted the Chambers of a United States Magistrate and was informed that a hearing could be conducted at approximately 4 p.m. that day. The defendant was transported from the City Jail to the marshal's lockup in the federal courthouse.

Having been informed that the defendant was in the marshal's lockup awaiting an opportunity to post bail, Agent Boronyak, accompanied by Postal Inspector Reilly, proceeded to the lockup about 12:30 p.m. to speak with the defendant. A conversation ensued at the lockup during which only the defendant, the DEA agent and the postal inspector were present. The defendant was advised of his *Miranda* rights. When asked to provide information, the defendant inquired of the officers as to what they could do for him in return for his cooperation. In the course of this give and take, Agent Boronyak informed the defendant

---

**3.** In considering the renewed motion to suppress, the parties and the Court rely on the Joint Appendix filed in the Fourth Circuit in connection with the appeal of the Court's earlier suppression Order.

**4.** The description of events which follows constitutes the Court's finding of facts based on the evidentiary hearing conducted on December 3, 1984.

**5.** Because it was made clear to the defendant at the time of his arrest that the DEA had ex-

pressed no interest in seizing his truck, the Court rejects the contention of defendant's counsel that defendant's later confession was motivated in part by a desire to obtain or retain possession of his truck.

**6.** Agent Corout denied making this statement. He was unsure as to whether the defendant's need for a bondsman had been discussed. The Court credits the defendant's testimony on this point.

that the government had fifteen or sixteen counts to bring against the defendant.[7] The defendant was promised that in return for his cooperation, his bond would be lowered so that he could be released that afternoon without the necessity of a bondsman.[8] The defendant was also promised that in return for his statement, he would be allowed to plead to reduced charges.[9]

Following the agent's proffer of the *quid pro quo*, the defendant gave an oral statement to the agents regarding the circumstances surrounding his receipt of the airmail parcels which led to his arrest. Thereafter, Agent Boronyak, Inspector Reilly, and the defendant walked across the street to the Baltimore DEA office where the defendant signed a written waiver of rights and executed a written statement regarding his participation in the crimes now charged. The defendant's cooperation was made known to an Assistant United States Attorney who procured the defendant's release that afternoon on personal recognizance.

One week later, a five-count indictment was filed against the defendant. During the weeks following defendant's release, the defendant and his counsel met on several occasions with representatives of the United States Attorney's Office and the DEA to make a proffer of cooperation and to work out the details of a plea agreement. All of these efforts failed, as the parties were unable to agree upon the terms of the agreement.[10] On September 20, 1984, the defendant filed a motion to suppress the oral and written statements given to Agent Boronyak and Inspector Reilly on August 15.

### Conclusions

■ Whether a custodial confession is involuntary, and thus subject to suppression, is a question of fact to be determined from the totality of the circumstances surrounding the confesion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Wertz*, 625 F.2d 1128, 1133–34 (4th Cir.1980). A court should consider the setting in which the confession was obtained, the details of the interrogation and the particular characteristics of the accused in arriving at a determination of whether the accused's confession was induced by conduct and conditions that deprived his confession of voluntariness. *United States v. Wertz*, 625 F.2d at 1134.

■ While the Supreme Court has stated that the test for voluntariness "is whether the confession was 'extracted by any sort of threats or violence, or obtained by *any direct or implied promises, however slight, or by the exertion of any improper*

---

7. No charges had been presented to the grand jury at the time of this statement.

8. Agent Boronyak and Inspector Reilly testified on direct examination that they made no promises to the defendant. When asked on cross examination whether he had promised that the defendant could plead to a lesser charge, Agent Boronyak testified:

    No, sir. As a matter of fact, I advised Mr. Shears that it is the policy of the United States Attorney's office that any cooperation does not mean that you will automatically walk out of here. I made that perfectly clear.

    In fact, I told him that he will have to plead guilty to a narcotic violation, I said that violation he would plead guilty to would be up to the U.S. Attorney, that I did not have that decision to make but that he would definitely be pleading guilty.

Joint Appendix at 145.

The Court credits the testimony of the defendant regarding promises made to him prior to his giving the statements which are the subject of the instant motion.

9. Defendant at one point in his testimony described the agent's promise to allow the defendant to plead "to a lesser count;" at other points in his testimony, defendant described the agent's representation that defendant could "plead to a lesser sentence." (See Joint Appendix at 159, 163 and 174).

10. The defendant testified that the Assistant U.S. Attorney would not accept a plea agreement unless it included the defendant's undertaking to plead guilty to an offense subjecting the defendant to a possible penalty of fifteen years imprisonment. The defendant further testified that this position of the U.S. Attorney's Office was inconsistent with the promise made by the DEA agent that the defendant would be allowed to "plead to a lesser sentence."

*influence,'* "[11] cases in the Courts of Appeal indicate that "government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary."[12] There are, nevertheless, "certain promises whose attraction renders a resulting confession involuntary if the promises are not kept."[13] Where a confession is challenged by a defendant as involuntary, the burden is upon the prosecution to prove at least by a preponderance of the evidence that the confession was in fact voluntarily rendered. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

In the case at bar, defendant's statements followed promises by government agents that the defendant would be released without posting a cash bond or paying a bondsman's premium. The defendant was also promised that he could plead to reduced charges if he cooperated and made a statement. These promises constituted the principal and determinative factor motivating the defendant to give the statements now challenged. These assurances of lenient treatment, viewed in the totality of the circumstances, were improperly coercive and rendered the resulting statements involuntary. *See Grades v. Boles,* 398 F.2d 409 (4th Cir.1968); *see also Shotwell Mfg Co. v. United States,* 371 U.S. 341, 347–48, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963). Because the government has failed to prove that the statements were voluntarily made, their use at defendant's trial would violate the Fifth Amendment privilege against self-incrimination. Accordingly, defendant's motion to suppress statements will be granted.

For the reasons stated herein, it is this 2nd day of August, 1985, by the United States District Court for the District of Maryland,

ORDERED:

1. That defendant's motion to suppress statements is GRANTED; and,

2. That the Clerk of the Court shall mail copies of this Memorandum and Order to all counsel of record.

---

**11.** *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curiam) quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897) (emphasis added). The Court in *Hutto* held that where the accused had been informed that the terms of a plea bargain were available regardless of whether he made a statement, the statement later given was not *per se* inadmissible merely because it was made subsequent to the plea bargain which was never executed.

**12.** *United States v. Shears,* 762 F.2d 397, 401 and cases cited therein.

**13.** *Id.* at 402 and cases cited therein.